# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **KAREN MEYERS, as Administratrix of** | : | **Case No.  1:17-cv-521** |
| **the Estate of GABRIEL TAYE,** | : | |
| **c/o Gerhardstein & Branch Co. LPA** | : | **Judge** |
| **441 Vine Street, Suite 3400** | : | |
| **Cincinnati, Ohio, 45202** | : | |
| | : | |
| **and** | : | <u>**COMPLAINT AND JURY DEMAND**</u> |
| | : | |
| **CORNELIA REYNOLDS,** | : | |
| **c/o Gerhardstein & Branch Co. LPA** | : | |
| **441 Vine Street, Suite 3400** | : | |
| **Cincinnati, Ohio, 45202** | : | |
| | : | |
| **and** | : | |
| | : | |
| **BENYAM TAYE,** | : | |
| **c/o Gregory S. Young Co., LPA** | : | |
| **600 Vine Street, Suite 402** | : | |
| **Cincinnati, Ohio, 45202** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CINCINNATI BOARD OF EDUCATION** | : | |
| **2651 Burnet Avenue** | : | |
| **Cincinnati, Ohio 45219** | : | |
| | : | |
| **and** | : | |
| | : | |
| **MARY RONAN** | : | |
| **SUPERINTENDENT** | : | |
| **Cincinnati Public Schools** | : | |
| **2651 Burnet Avenue** | : | |
| **Cincinnati, Ohio 45219** | : | |
| **In her Official Capacity as Superintendent** | : | |
| **of Cincinnati Public Schools** | : | |
| | : | |
| **and** | : | |
| | : | |
| **RUTHENIA JACKSON,** | : | |
| **C/O Cincinnati Public Schools** | : | |

1

| | |
|---|---|
| **2651 Burnet Avenue** | **:** |
| **Cincinnati, Ohio 45219** | **:** |
| | **:** |
| ***Individually and in her Official Capacity as*** | **:** |
| ***Principal of Carson Elementary School*** | **:** |
| | **:** |
| **and** | **:** |
| | **:** |
| **JEFFERY MCKENZIE** | **:** |
| **C/O Cincinnati Public Schools** | **:** |
| **2651 Burnet Avenue** | **:** |
| **Cincinnati, Ohio 45219** | **:** |
| ***Individually and in his Official Capacity as*** | **:** |
| ***Assistant Principal of Carson Elementary*** | **:** |
| ***School,*** | **:** |
| | **:** |
| **Defendants.** | **:** |

## I.   <u>INTRODUCTION</u>

1.   On January 26, 2017, eight-year-old Gabriel Taye ("Gabe") tied his necktie to his bunk bed and hung himself. He was a third-grade student at Carson Elementary School ("Carson") where he had been suffering from the aggressive, violent, and bullying behavior that was widespread and permitted by Cincinnati Public Schools and Defendants.  Two days earlier, a fellow student attacked Gabe in a bathroom at Carson. Gabe collapsed on the bathroom floor and lost consciousness almost immediately, spending more than seven minutes unconscious on the floor while students repeatedly taunted and kicked him.[1]

2.   When Gabe entered the bathroom, he had an expectation of safety because there was a surveillance camera watching and recording everything.  Gabe and the students who attacked him knew they were on camera, yet they persisted in their vicious kicks and taunts.

---
[1] See Exhibit A – Video of Carson Elementary School boy's bathroom January 24, 2017 (redacted).

3. It was obvious that Gabe had suffered a trauma and likely an assault. He was at obvious risk of injury. Despite the obvious trauma Gabe experienced, Defendants recklessly and deliberately withheld vital information from his mother, including that he had been assaulted, lost consciousness for a considerable period of time, and was at risk of a serious head injury. Defendants informed his mother only that Gabe had fainted in the boy's restroom and had recovered completely. Defendants' concealment of the violence and harm to Gabe prevented his mother from seeking appropriate treatment for trauma and potential medical injuries. Had she known of the extreme violence at Carson, she would never have continued to send him to school there.

4. Aggressive behavior, aggression, violence, bullying, intimidation, and harassment (collectively referred herein as "aggressive behavior") was common at Carson. Defendant school officials not only knew that student-on-student aggression was rampant, especially in the unsupervised bathrooms, but chose to cover it up rather than alert parents and the school community so the violence could be investigated and resolved. Despite the official statistic that Carson reported to the public that it had zero bullying incidents during the first half of the 2016-2017 school year, Defendants were aware of, permitted, did not abate, and in fact harbored the bullying, physical aggression, harassment, intimidation, and exceptionally destructive unsafe climate that persisted at Carson. Defendants hid this information from parents, including Gabe's parents, who, unaware of the dangers their children faced, were deprived of the ability to protect their children from the multitude of dangers present at Carson. Had Gabe's parents known the dangers Gabe faced at Carson, they would not have continued to send him to school there. Defendants, with utter reckless wanton disregard for Gabe, permitted a treacherous school

environment to become even more so by withholding these critical facts and covering up the risk to Gabe's safety.

5.   Plaintiff now brings this case seeking fair compensation for Gabe's untimely death and to ensure that in the future, the students at Carson are kept safe and the school administration institutes appropriate mandatory training and policies to ensure that no further cover-up of bullying and aggressive behavior can ever happen again.

## II.   JURISDICTION

6.   Jurisdiction over the federal civil rights claim is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(3) and (4). Jurisdiction over the state law claims is conferred by 28 U.S.C. § 1367(a). Venue is proper in this Division.

## III.   PARTIES

7.   Plaintiff Karen Meyers is the administratrix of the estate of Gabriel Taye, who is deceased. Meyers brings this action for the benefit of the next of kin of Gabriel Taye, including his two parents, Cornelia Reynolds and Benyam Taye.

8.   Plaintiff Cornelia Reynolds is the mother of Gabriel Taye. She is a resident of Hamilton County, Ohio.

9.   Plaintiff Benyam Taye is the father of Gabriel Taye. He is a resident of DeKalb County, Georgia.

10.   Defendant Cincinnati Board of Education is a political subdivision capable of suing and being sued under the law of Ohio. Cincinnati Board of Education operates Cincinnati Public Schools ("CPS").  The term "CPS Defendants" refers collectively to Defendants Ronan, Jackson, McKenzie, and Cincinnati Board of Education.  The terms "CPS" and "Cincinnati Public Schools" refer to Defendant Cincinnati Board of Education.

11.    Defendant Mary Ronan was at all times relevant to this action the Superintendent of Cincinnati Public Schools. Defendant Ronan is a "person" under 42 U.S.C. §1983 and at all times relevant to this case acted under color of law. Ronan is sued in her official capacity as an employee of Cincinnati Public Schools.

12.    Defendant Ruthenia Jackson was at all times relevant to this action the principal of Carson Elementary School, a school in the Cincinnati Public Schools system. Defendant Jackson is a "person" under 42 U.S.C. §1983 and at all times relevant to this case acted under color of law. Jackson is sued individually and in her official capacity as an employee of Cincinnati Public Schools.

13.    Defendant Jeffrey McKenzie was at all times relevant to this action the assistant principal of Carson Elementary School, a school in the Cincinnati Public Schools system. Defendant McKenzie is a "person" under 42 U.S.C. §1983 and at all times relevant to this case acted under color of law. McKenzie is sued individually and in his official capacity as an employee of Cincinnati Public Schools.

## IV.    <u>STATEMENT OF FACTS</u>

14.    Gabriel Taye, born and raised in Cincinnati, Ohio, was an adorable, vibrant, and loving eight-year-old boy.  He loved to sing and dance, play basketball and football, fish with his mother and play games with his father.

15.    According to a teacher, Gabe was not known to his peers as a "cool kid" in third grade because he was a good kid who wanted to be friends with people; he was smart, wanted to learn, earned good grades, avoided fights and arguments, and loved to dress up for school, including wearing neck ties. Gabe loved to learn and teach others what he was learning.  His parents instilled the importance of a good education in him.  His mother earned her license practical

nursing degree and his father earned a two-year degree in mechanical engineering. His parents worked hard to provide Gabe with a good childhood and instilled in him the importance of getting a good education.

16. Gabe started attending Carson Elementary School in first grade at the beginning of the 2014-2015 school year.

17. Gabe excelled academically in first and second grade, but his grades began to fall during third grade. Neither his teachers nor school officials told his mother why his grades were declining.

18. Neither of Gabe's parents had any reason to believe that Gabe was suicidal.

**CPS Defendants Fostered and Covered Up Bullying and Aggressive Behavior at Carson Elementary School**

19. It is the goal of the State Board of Education to enhance/create positive learning and teaching environments. The State Board of Education defines a positive climate as "one that emphasizes and recognizes positive behaviors, evokes nonviolence, cooperation, teamwork, understanding and acceptance toward all students and staff in, and in transit to and from, the school environment."[2] The Ohio Department of Education provides CPS with "model policies and strategies that eliminate negative behaviors and recognize positive behaviors that promote safe and secure learning environments for all students and staff. This model policy has informed local schools as they establish policies that assist school personnel to identify and address issues of bullying, intimidation and harassment that occurs between students[.]"[3] CPS Defendants have chosen not to adopt or follow these policies at Carson.

---

[2] Ohio Department of Education, *Anti-Harassment, Anti-Intimidation or Anti-Bullying Model Policy*, page 3, https://education.ohio.gov/getattachment/Topics/Other-Resources/School-Safety/School-Safety-Resources/Anti-Harassment-Intimidation-and-Bullying-Model-Po/Anti-HIB-Model-Policy-FINAL-update-incl-HB116-100912.pdf.aspx.
[3] *Id.*

20. Ohio Revised Code 3313.666 requires CPS to establish policies that assist school personnel to identify and address issues of bullying, intimidation and harassment that occurs between students.

21. O.R.C. 3313.666(B)(5) further requires that the custodial parent or guardian be notified of any incidents involving their child.

22. O.R.C. 3313.666(B)(11) requires the district administration to semiannually provide the president of the district board a written summary of all reported incidents of harassment, intimidation or bullying and post the summary on the district's website.

23. The Ohio Department of Health provides emergency guidelines ("guidelines") to schools to serve as a basic "what-to-do-in-an-emergency" information for school staff *without* nursing or medical training when the school nurse is *not* available.[4] The guidelines refer to "unconsciousness" as one of the most severe symptoms and advise to immediately call 9-1-1.[5]

24. Carson is a failing CPS school.   In 2015-2016 it failed in every category measured: Achievement, Gap Closing, Progress, and K-3 Literacy. It has received failing grades for Achievement since 2013. Before 2013 it was on "academic emergency" for a number of years.

25. Since 2014, Carson's third grade student passage rate for state tests in English and Math have rapidly declined.  Carson's 2015-2016 State report card shows that only 25% of the students passed the third grade English proficiency test.  Carson third graders had the worst English test results in the district, where the district rate was 46.6% passing rate.  Statewide, the passage rate was 54.9%.  Even more shocking, the 2015 Carson passage rate represented a decline from the 2014 73% passage rate. The math proficiency scores were equally as dismal: Carson had a 28% passage rage in 2016, down from a 55% passage rate in 2014.

---

[4] ODH 3610.13 (Rev. 2/07).
[5] *Id.*

26.     In addition to poor testing scores, Carson students had a 35% absenteeism rate.

27.     Carson is one of 40 elementary schools and one of 56 total schools in the Cincinnati Public Schools system.  During the 2015-2016 school year, Carson served approximately 860 students, from preschool through sixth grade.

28.     According to the Semiannual Report on Harassment, Intimidation and Bullying, CPS reported "0" bullying incidents at Carson for the period of August 17, 2016 through December 16, 2016.  This period of time represents the first half of Gabe's third grade school year. During the second half of the year, CPS reported "4" bullying incidents at Carson, but none involving Gabe or the other students attacked in the bathroom incident on January 24, 2017.

29.     Contrary to the claim made publicly by Defendant CPS, as required by O.R.C. § 3313.666(B)(11), there were incidents of bullying at Carson during the 2016-2017 school year. As a result, CPS Defendants not only fostered aggressive behavior, but they harbored it, thus secreting the need to and ability of parents to protect their children.

30.     According to the Carson behavior logs of just ten students, aggressive behavior was a routine occurrence at Carson.  The CPS Defendants were fully aware of the aggressive behavior from the behavior logs they maintained for each student.

31.     On December 7, 2016, school documents state that Student #7 "was very disruptive and bullying another student this afternoon." Despite this incident occurring during the period covered by CPS's report on bullying, it was intentionally excluded from the semiannual report for the first half of the 2016-2017 school year.

32.     On December 12, 2016, school documents state that Student #6 "was bullying another student today – the same student he has been investigated previously for bullying." Despite this

8

incident occurring during the period covered by CPS's first half-year report on bullying, it was intentionally excluded from the semiannual report.

33. In addition to the incidents Carson explicitly labeled as bullying, there are many other incidents of what is described as bullying and aggressive behavior by students against other students during this first half of the 2016-2017 school year that were required to be included by O.R.C. § 3313.666(B)(11), but Defendants intentionally excluded from the semiannual report. The following examples are taken from the CPS logs of student behavior.

34. On August 25, 2016, Student #1 punched a student and threw a chair. Also on this date, Student #3 punched another student repeatedly.

35. On August 28, 2016, Student #9 choked two students and threatened them.

36. On September 1, 2016, Student #2 threw a chair, taunted a student, and used profane language.

37. On September 12, 2016, Student #7 made jokes about a student.

38. On September 29, 2016, Student #8 hit a student because she was reading too loudly.

39. On October 3, 2016, Student #8 stole a student's pencils, repeatedly kicked her desk, assaulted a teacher three times, pushed the desk five to six times, and pushed the desk hard into a classmate.

40. On October 4, 2016, Student #6 repeatedly threatened a student verbally and physically.

41. On October 6, 2016, Student #7 tormented an African American student by saying he looked like a monkey and walked around threatening other students and calling them stupid.

42. On October 11, 2016, Student #7 roamed the room threatening to beat up students and harassing them.

43. On October 12, 2016, Student #8 called other students ugly and babies, flipped a desk three times, and pushed a classmate.

44. On October 13, 2016, Student #3 threatened a student with nail clippers. Also on that day, Student #9 threw three chairs and tried to fight a student.

45. On October 14, 2016, Student #2 put a student in a chokehold and wrestled him to the ground.

46. Also on that day, Student #5, a third grader, threw a chair and yelled at a female classmate that "I wish I had a gun so I could rape her."

47. Student #5 also threatened to shoot a teacher.

48. On October 20, 2016, Student #10, a first grader, walked up behind a student and tried to choke him.

49. On November 1, 2016, it was reported that Student #8, a first grader, was hitting others daily. On that day, he pushed a student against the fence and punched him.

50. On November 17, 2016, Student #8 held a student down so that others could punch him.

51. On December 7, 2016, Student #8 yelled at a classmate, threatened to punch her, teased another classmate, and called him a baby. The student threatened to punch multiple students in the face.

52. On December 14, 2016, Student #2 stomped on another student while she was on the floor, and continued as she tried to escape.

53. These examples of aggressive behavior are compiled from the behavior logs of only ten students at Carson. Upon information and belief, more examples exist of this violent behavior from the 2016-2017 school year at Carson.

54.    The following examples come from the families of other students at Carson who have been victims of aggressive behavior like Gabe.

55.    Parent #1 had a child, Child #1, enrolled at Carson, but had to pull her out of school because the bullying she experienced made her want to harm herself.

56.    Parent #2's daughter, Child #2, attended Carson and had to be taken out of school because of the bullying she experienced. She was beaten up by a group of girls, but the girls were never disciplined, and no report was made. Attempts to address the situation with the school were unsuccessful. When she asked about the bullying policy, Defendant Jackson told her "we don't have problems with that here."

57.    Parent #3's daughter, Child #3, a fourth grader at Carson, has been bullied since kindergarten. It has included name-calling and physical aggression, including kicking, having pencils thrown at her face, being chased, being threatened that she would be pushed down the stairs, and being assaulted on the bus by five to six older students. When Child #3 was assaulted on the bus in April 2017, students held her down while another hit her in the face. She suffered cuts, scratches, bruises, and a sore neck. She has refused to get back on the bus since the incident. After the assault on the bus, she was told to "go hang herself," by two or three different students. Parent #3 filed a police report about the assault on the bus, but nothing came of it because the school would not give her any information. She specifically tried to get video from the bus, but her request was refused.

58.    Parent #4's son, Child #4, has been bullied for years at Carson, both verbally and physically. Despite a pattern of repeated bullying by the same student, the school would not contact her when the bullying happened; she would only know if her son told her about it. The only time she heard from the school was the one time her son defended himself and got in

11

trouble.  When she tried to discuss her son's bullying with Defendant Jackson, Jackson refused

to see her until Parent #4 forced her way into Defendant Jackson's office.  The bully was

separated from her son for only one day and then the bullying resumed.  In October 2016, on

three separate occasions, Child #4 wrote in his journal at school that he was tired of school, sick

and tired of being bullied, tired of being picked on and nobody doing anything about it, so he

wanted to just die. Despite CPS and Defendant Jackson knowing about the first two entries, they

chose not to inform Parent #4 until the third entry.  When Parent #4 asked why she was not

informed sooner that the school knew that her son was suicidal, she was told that the "office

staff" talked to Child #4 and determined that he was not a threat to himself and, thus she did not

need to be informed. Parent #4 took Child #4 for at Cincinnati Children's Hospital Medical

Center ("CCHMC"), where he was treated. Since Gabe died, students at Carson have been telling

Child #4 "go hang yourself like Gabe" and "go kill yourself or I'll do it for you."

59.    During the bathroom incident on January 24, 2017, several boys were attacked.  One,

student, D. A., was punched twice and was in obvious pain.  Two parents came forward to CPS

after the video of the bathroom incident aired and asked to see the unredacted video because both

mothers thought D. A. was their son.  CPS would not tell either parent if the victim was their

son.  Both mothers, afraid for their son's safety, removed her child from Carson for the

remainder of the school year.

60.    CPS Defendants recklessly withheld from Gabe's parents the dangers to him at Carson.

The destructive and dangerous climate at Carson violated policy and created an unsafe

environment for Carson students, including Gabe.

**The Events Leading to Gabe's Death**

61. Gabe was injured in first and second grade; however, by third grade, it became clear to his mother that his injuries were caused by aggressive student behavior.

62. In first grade, on September 23, 2014, Gabe was injured on the playground at Carson. CPS officials reported to his mother that his injuries were not severe and that he had an accident on the playground. His mother was worried about his front teeth that appeared to be knocked in. She took him to a dentist who had to pull his two front teeth. Now looking back on it, his parents wonder if he was the victim of aggressive behavior that the CPS Defendants did not want to report it.

63. In second grade, Gabe was hit by a student on October 7, 2015. He was hit again by a student on February 22, 2016; this time needing to be treated by the nurse. Neither incident was reported to his parents; they learned of the incidents after he died.

64. At the end of second grade, on May 4, 2016, there was an "incident" on the playground. School records indicate that "proper action" was taken regarding the "other student," suggesting that this other student did something to Gabe, but no further details were recorded by the school. CPS Defendants did not alert Gabe's parents about the "incident." If Carson employees had attempted to contact his mother but were unable to reach her, they should have contacted his father, who was an emergency contact. CPS never contacted his father about this "incident."

**A. Aggressive Behavior Escalated in Third Grade**

65. During third grade, Gabe suffered injuries at school with no signs the injuries were caused by aggressive behavior. Following each of these incidents, his mother was notified of his scrapped knee, bumped elbow, bumped wrist, and twisted ankle.

66.  During third grade, Gabe was the victim of at least six incidents of aggressive student behavior.  CPS Defendants did not notify his parents of three of these aggressive incidents. While CPS Defendants did notify his mother of three of these incidents, they withheld critical information that was needed in order for his mother to protect him from further harm.

      **1.**      **Gabe was the victim of aggressive behavior but his parents were not notified.**

67.  On September 7, 2016, according to only school records, Gabe shoved and punched another student and was reprimanded.  A CPS employee logged that she left a voicemail with his mother but Ms. Reynolds did not receive a message.  CPS employees did not tell his mother about the incident; she only learned of it after his death.  She now wonders if Gabe was defending himself from bullying by a student. CPS Defendants did not follow-up with Ms. Reynolds, who would have inquired and addressed the matter appropriately.  Nor did CPS Defendants contact Mr. Taye, who should have been contacted if his mother was not reachable.

68.  On October 3, 2016, Gabe was in an altercation with a boy.  A CPS employee recorded in a log that she left a voicemail with Gabe's mother.  However, Ms. Reynolds did not receive a message.  There was no effort to contact Mr. Taye when Ms. Reynolds was not reached. CPS did not follow-up with either parent to let them know what happened to Gabe.

69.  On October 7, 2016, Gabe was punched by a student and defended himself by punching back. Security had to be called, but the aggressive student merely got off with a warning.  CPS officials told Gabe that if he punched a student in self-defense, he would also be disciplined. CPS Defendants did not contact either of Gabe's parents to notify them that Gabe had been punched, injured, or warned he could not defend himself.

**2.      Gabe was the victim of aggressive behavior but CPS Defendants withheld critical information from his parents.**

70.    On October 31, 2016, Gabe suffered a head injury on the playground, but his mother was not told how it happened and was only told he could return to class. CPS Defendants did not show Gabe's mother a video or explain how Gabe was injured.

71.    On January 9, 2017, two students, C.J. and P.B., attacked Gabe and punched him in his mouth.  Upon information and belief, C.J. is Student # 5 from the behavior logs.  The incident was over a can of pop Gabe dropped and the boys took away from Gabe. Gabe suffered a bloody lip and was treated by the school nurse.  The nurse called Gabe's mother and told her Gabe was punched in the face by two students and had a bloody nose and mouth.  Ms. Reynolds then spoke to Defendant McKenzie who told her he did not know the whole story yet but would review the surveillance recordings and meet with C.J. and P. B.

72.    On January 10, 2017, Defendant McKenzie met with C.J. and P.B. and one of them told Defendant McKenzie that Gabe was punched in the mouth by a third, unidentified student. Defendant McKenzie did not believe a third student hit Gabe and gave C.J. and P.B. removal letters and removed them from school that day.  Defendant McKenzie did not inform Gabe's mother of his finding or disciplinary decision.

73.    On January 12, 2017, Defendant McKenzie met with Ms. Reynolds, Gabe, C.J., P.B. and P.B.'s father. He never told Ms. Reynolds that the boys admitted Gabe was punched in the mouth; or that the boys allegedly pretended that the punch was by a third student; or that McKenzie had removed the boys from school.  Instead, McKenzie said the video he reviewed did not show the incident, which took place in the hallway near the art room.  When Ms. Reynolds asked to see a copy of the video, McKenzie refused.  McKenzie determined the incident was "***horseplay***" and did not discipline C.J. or P.B.  The incident was ruled "an

accident." He only issued a warning to C.J. and P.B., telling them if this occurred again they would face further discipline. Despite this warning, later that day, after C.J. and P.B. injured another child, McKenzie did not discipline either boy. Because CPS Defendants withheld from his mother the totality of the dangerous climate Gabe faced at Carson, Ms. Reynolds did not realize how much danger her son was in by remaining at Carson.

74. On January 18, 2017, Student J[6] walked over to Gabe, who was seated at the lunch table eating his lunch. Student J kicked at Gabe, landing the blow to Gabe's thumb and to his lunch tray, which fell to the floor. Ms. Reynolds was not informed who kicked Gabe and was not shown the video.

**B.  Aggressive Behavior in the Boy's Bathroom on January 24, 2017**

75. On January 24, 2017, starting at 12:11 p.m., a boy ("P.A.")[7] was attacking at least three boys as they entered the bathroom.[8] CPS Defendants, including Principal Jackson and Assistant Principal McKenzie, routinely did not provide any adult supervision in the bathrooms. P.A. punched one boy, (D. A.), so hard he fell to the ground on all fours and curled up around the site of impact. P.A. leaped into the air to attack another boy. And then Gabe walked into the bathroom.

76. Gabe could not enter the bathroom without passing P.A. Gabe extended his hand to P.A. as if to shake his hand. P.A. grabbed Gabe's hand and aggressively yanked him toward the wall behind P.A. Gabe's head struck something out of view and he collapsed on the floor. On the video, P.A. appears to celebrate his takedown of Gabe.

---

[6] Plaintiffs do not know the last name of Student J.

[7] Plaintiff Reynolds believes P.A. (which stands for Primary Aggressor, a moniker the Cincinnati Police Detective gave this boy in the video) is C.J. or P. B. but to this day CPS has never told her who attacked her son. The Detective asked Defendant McKenzie if P.A. was either C.J. or P.B. but he did not receive a response.

[8] The events in the bathroom were recorded by CPS and are depicted in Exhibit A. P.A. enters the bathroom at timecode 11:33. Gabe enters the bathroom at 13:12. Defendant McKenzie enters at 17:59.

77.    Gabe remained unconscious, lying motionless on the bathroom floor for more than

seven minutes, while over a dozen students came in and out of the bathroom, pointing at him,

mocking him, and kicking him. The callous indifference of the student witnesses not involved in

the assault, who had knowledge of the video camera pointing directly at them, speaks to the

environment of tolerance of bullying and aggression at Carson. Other students ignored his

circumstance, indicating a tolerated environment in which there was an utter disregard for others.

78.    Eventually, Defendant McKenzie responded to the bathroom, followed later by

Defendant Jackson and other Carson staff.   Defendant McKenzie stood over Gabe, moved a

trash can out of the way but did not get on the floor to check Gabe, to check for breathing, to talk

to him, or to assess him.

79.    Gabe regained consciousness shortly after the school nurse, Margaret McLaughlin,

arrived, which was around two minutes after Defendant McKenzie first found Gabe unconscious.

80.    After Gabe regained consciousness, he was evaluated by nurse McLaughlin.

81.    Nurse McLaughlin did not call 911; instead, she called Gabe's mother about an hour

later and told her that Gabe had "fainted," was "alert," and his "vitals [were] fine."  Ms.

Reynolds asked if he needed to go to the hospital but was told he needed no further medical

treatment.  No Defendant ever told Ms. Reynolds that her son had been attacked in the bathroom,

that the bathroom was unsupervised, that other boys were attacked in the bathroom by the same

student, or that her son had laid unconscious on the bathroom floor for over seven minutes while

being taunted and abused by other students. Defendants did not instruct the school nurse to tell

Ms. Reynolds any of this either. Instead, the information CPS provided to Ms. Reynolds was

intentionally minimized so that she would not inquire further about the details of what had

transpired in the bathroom.  Ms. Reynolds had no reason to suspect that the information she was

provided was incomplete, inaccurate, erroneous, or misrepresented. CPS also did not inform the parents of the other boys attacked in the bathroom.

82. The violent acts in the bathroom constituted child abuse under O.R.C. § 2151.031, yet none of the mandated reporters, including Defendants Jackson and McKenzie, reported it to authorities.

83. Ms. Reynolds asked Gabe what happened at school that day but all he could remember was that he fell and hurt his stomach.[9] That night, Gabe complained of stomach pain and nausea. He vomited twice. His mother took him to CCHMC.

84. Based on an evaluation of Gabe's known gastrointestinal symptoms and the trusted statement by the school nurse that he had "passed out" at school, CCHMC diagnosed him with "likely viral gastro with LLQ pain." They discharged him. Had his mother known about the attack and extended unconsciousness she would have taken Gabe immediately to the hospital and told his doctors what happened. Had his doctors known about the attack and unconsciousness he would have been evaluated for head trauma.

85. The Center for Disease Control publishes guidance on concussions and brain injury on their website.[10] It describes symptoms and signs of concussion in this guidance, as well as precautions that should be taken. Symptoms may appear immediately, or may take days or even months to appear. Among other symptoms, sadness, irritability, and confusion are commonly experienced after a concussion or head trauma.

86. On January 25, 2017, Gabe's mother kept him home from school since he was worn out from being in the hospital until 6 o'clock in the morning.

---

[9] Ms. Reynolds talked to Gabe by phone while he was at school and asked what happened. Gabe said he hit his stomach outside. In hindsight, Ms. Reynolds believes that Gabe did not feel free to talk to her.
[10] U.S. Department of Health and Human Services Centers for Disease Control and Prevention, *Facts About Concussion and Brain Injury*, https://www.cdc.gov/headsup/pdfs/providers/facts_about_concussion_tbi-a.pdf.

87.　On January 26, 2017, Gabe's mother sent him back to school, a decision she would never had made if she had only known about the attack in the unsupervised boy's room, his extended unconsciousness, his risk of experiencing head trauma, and the dangerous environment at Carson that the CPS Defendants were covering up.

88.　While at school that day, there was another incident in a boy's bathroom. Two boys accosted Gabe and stole his water bottle.  Upon information and belief, one of these boys was Student #2.  They then tried to flush it down the toilet in front of him.  Gabe reported the incident to a teacher but no one else.  Because Defendants did not report the violent incident earlier that week internally or externally or otherwise notify the staff, the teacher did not know about the assault two day's prior and thus he did not recognize the seriousness of this incident.

89.　After Gabe came home from school around 5:30 p.m., he took one of the neckties he wore to school and used it to hang himself from the top bunk of his bunk bed. His mother had only left him alone for about fifteen minutes.

90.　Gabe's mother found him hanging from the bunk bed and unresponsive.

91.　Horrified and screaming, his mother cut her eight-year-old son down herself.  As a nurse, she started CPR.  A neighbor responded to her cries for help and took over the CPR as Ms. Reynolds called 911. Ms. Reynolds was so distraught that she had a difficult time explaining to the 911 dispatcher that she had found her son hanging.

92.　The police and firefighters arrived.  The paramedics took over the CPR and attempted to revive Gabe, but were unable to do so.  He had no pulse. As they took him away, his mother was screaming through her tears, "Why Gabe? Why Baby? Why did you do it?"  She had no idea what caused him to try to kill himself.

93.　Gabe was pronounced dead at CCHMC at 6:35 p.m.

**Bullying Leads to Suicide**

94.   Many studies have established a connection between bullying and suicide in young people. The phenomenon is sometimes colloquially referred to as "bullycide."

95.   These studies have found that bullying is a significant contributor to suicidal ideation.[11]

96.   Frequent physical assault is also associated with increased odds of suicidal ideation.[12]

97.   A review of cross-sectional and longitudinal findings showed that "there is an increased risk of suicidal ideation and (or) suicide attempts associated with bullying behavior."[13]

98.   As educators, Defendants are well aware of the link between bullying and suicide in school children.

**CPS Defendants Were Deliberately Indifferent to the Risk of Harm and Breached Duty to Protect Carson Students**

99.   Despite incidents described in paragraphs 32 - 59 above, the Semiannual Report on Harassment, Intimidation and Bullying reported that "0" (zero) acts of bullying took place at Carson between August 17, 2016 and December 16, 2016.

100.  Defendants Cincinnati Board of Education, Superintendent Ronan, Principal Jackson, and Assistant Principal McKenzie knew of the risk bullying and aggressive behavior had on Carson students, including the risk of suicide. CPS provided Defendants with training linking bullying, violence and aggression at school to suicide.

---

[11] Suicidal ideation among suburban adolescents: The influence of school bullying and other mediating risk factors. J. Child Adolesc. Ment. Health, 2016 Oct; 28(3): 213-231.

[12] Associations of childhood bullying victimization with lifetime suicidal behaviors among new U.S. Army soldiers. Depress Anxiety, 2017 Apr 3.

[13] The Association of Suicide and Bullying in Childhood to Young Adulthood: A Review of Cross-Sectional and Longitudinal Research Findings.

101. Defendants Cincinnati Public Schools, Superintendent Ronan, Principal Jackson, and Assistant Principal McKenzie knew bullying and aggressive behavior occurred at Carson during Gabe's enrollment.

102. In response to the known risk of suicide, Cincinnati Board of Education concluded its Board policy on "Bullying and Other Forms of Aggressive Behavior" with a statement about suicide prevention:

**SUICIDE PREVENTION**
     **Students face a wide range of issues and concerns that can have a substantial impact on their ability to learn and on their engagement with school. Perhaps the most severe issue faced by students is that of depression accompanied by suicidal ideation. The school district takes these mental health issues seriously. To further this objective, the Superintendent shall develop and implement administrative guidelines whereby members of the professional staff understand how to use an intervention procedure.**

103. The Cincinnati Public Schools Code of Conduct defines bullying as "any repeated written, verbal, graphic or physical act that a student or group of students exhibit toward another particular student or students… and the behavior both: A) Causes mental or physical harm… and B) Is sufficiently severe, persistent or pervasive that it creates an intimidating, threatening or abusive educational environment."

104. The Code of Conduct classifies "Bullying/Harassment/Intimidation" as an infraction, and lists a variety of possible choices to address the infraction, ranging from conferencing with the student to filing criminal charges.

105. Defendant Cincinnati Public Schools' policy on bullying and other forms of aggressive behavior requires that the school investigate all reported incidents of bullying, calls for steps to be taken to protect the victim, and calls for notification of the victim's parents.

106. Defendant Cincinnati Public Schools does not have a policy that prohibits bullying and other forms of aggressive behavior that do not fit its narrow definition.  Nor does CPS require prevention, investigation, notification of parents, or reporting of other forms of bullying and

aggressive behavior that do not fit its narrow definition. By not having policies to prohibit, prevent, investigate, notify and report other forms of aggressive behavior, CPS permits acts of bulling, violence and aggression that does not fit its narrow definition. This policy is the moving force behind Defendants' constitutional violations alleged in this case.

107. By defining "bullying, harassment and intimidation" so narrowly, CPS encouraged violence and aggression to become rampant at Carson to the point where it was accepted as normal. This policy has allowed aggressors to intimidate and bully students without consequences; it made victims helpless to prevent or even report the aggression and violence they suffered and observed daily; it purposefully misled parents about the violence their children faced; it made teachers powerless to stop the aggression; and it purposefully deceived the community about how violent Carson is and why its students are failing to learn. CPS has established a pattern and practice of covering up the violence and aggression the students suffer at Carson.

108. As Superintendent, Defendant Ronan is the final decision-maker for all Cincinnati Board of Education policies, practices, and decisions to cover-up and harbor evidence of aggressive behavior at Carson.

109. Not only are these policies insufficient to protect students from bullying and student-on-student aggression, but CPS Defendants were also not following CPS policies. When a student complained of bullying or harassment or intimidation, Defendants CPS and Ronan did not ensure that CPS policies were followed, did not investigate the incident, did not treat the victim or address the bully with appropriate treatment, did not take action to notify parents or report the complaint. CPS Defendants acted in a wonton, willful, and reckless manner in disregarding Gabe's safety.

22

110. CPS Defendants knew that elementary students at Carson were in their custody; these students, including Gabe, could not protect themselves. CPS Defendants knew by withholding from parents and custodians, including Gabe's parents, vital information about the risk of harm Gabe and other students faced at Carson and by covering up the aggressive behavior students witnessed and experienced, that they prohibited parents from protecting their children.

111. CPS Defendants did not train Carson staff or students on how to identify, report, or investigate bullying, violence, aggression, intimidation, or harassment.

112. CPS Defendants did not adequately supervise Carson staff to ensure that staff was complying with their legal obligations or with Defendant CPS's policies to identify, report, or investigate bullying, violence, aggression, intimidation, or harassment.

113. The surveillance cameras lured students like Gabe into a sense of false security when they entered a place without adult supervision. CPS Defendants did not utilize surveillance to deter, monitor, report, and investigate bullying, violence, aggression, intimidation and harassment. Instead, CPS Defendants' use of surveillance encouraged aggressive behavior because the perpetrators knew their actions were either going unnoticed or would be disregarded, and hence, unpunished.

114. The placement of surveillance cameras by CPS Defendants, most notably at the restroom where Gabe's assault occurred, also indicates their knowledge of the danger that existed to students. Despite this knowledge, Defendants did not establish a monitoring policy and associated practice, review protocol, or record retention policy adequate to ensure a safe climate for their students and thus recklessly and carelessly placing their students in known danger. The failure to utilize the surveillance cameras was also deliberately indifferent.

23

115. CPS Defendants treat students injured by bullying and aggressive behavior differently than it treats students injured by accidents.

116. CPS Defendants treat accidents and other medical needs seriously, securing appropriate care for students.

117. For example, when Gabe accidentally fell on the playground at Carson, he was back-boarded and taken to CCHMC. Other students injured by an accident are appropriately treated and their parents are notified. However, Carson staff does not treat injuries resulting from bullying and student aggression the same.

118. When Gabe was assaulted in the bathroom, he hit his head and fell. He lost consciousness for over seven minutes. Despite this, he was not taken to the hospital, was not referred to a doctor, and his parents were deliberately not told what happened.

119. There is no legitimate reason for Defendants to treat students differently based on the cause of their injury.

120. The sufficiency of the Defendants' response to bullying and student aggression is belied by their failure to investigate, report, or inform the parents of the other boys who were assaulted in the video.

**Spoliation of Surveillance Recordings**

121. There were additional surveillance recordings of Gabe being bullied, harassed, and assaulted. There are thirty-one cameras inside Carson. No surveillance recordings were saved for any of the incidents involving Gabe's injuries at Carson other than Exhibit A. Once Gabe died and the school was notified, CPS Defendants did not preserve all surveillance recordings involving Gabe. When the police started investigating his death, CPS Defendants did not preserve all surveillance recordings involving Gabe. CPS Defendants did not preserve any

surveillance recordings of the incident involving Gabe in a bathroom the day he committed suicide. All or part of this incident would have been recorded, could have been preserved, but CPS Defendants destroyed the images.

122. Litigation over Gabe's death was probable and foreseeable. A student died following aggressive behavior at school, a police detective was investigating his death, and after his death his mother publicly questioned whether bullying contributed to his death. Plaintiff's counsel sent the first request for records to CPS on February 7, 2017.

123. CPS Defendants knew surveillance recordings of Gabe at Carson existed. Despite that knowledge, and despite the fact that they knew litigation was probable and foreseeable, Defendants did not save the surveillance recordings.

124. Upon information and belief, all surveillance recordings involving Gabe has been destroyed except for Exhibit A.

125. The destruction of the surveillance recordings at Carson of Gabe will disrupt Plaintiffs' cases because they lack additional evidence about the extent and nature of the bullying, harassment, and aggression Gabe suffered at Carson. Without all the evidence, it will be harder to succeed on their claims. They have also had to go to additional lengths to try to recover the lost evidence.

126. CPS Defendants destroyed all surveillance recordings of Gabe and the aggressive behavior at Carson in bad faith for the purpose of further covering up the danger Gabe was in at Carson.

**Spoliation of Evidence of Cause of Death**

127. Defendants intentionally concealed from Gabe's parents that he was attacked in the bathroom and left unconscious for over seven minutes two days before he died. Defendants did

not reveal these facts to Gabe's parents before his funeral or in the months following his death. It was not until several months later that his parents learned of the attack and loss of consciousness through their own investigation of his death.

128. As a result of this concealment, Ms. Reynolds did not know to inform CCHMC of the head injuries suffered by Gabe; accordingly, no neurological examination was performed.  Nor did Ms. Reynolds know to inform the coroner of his head injury.  Therefore, the coroner may not have had all of the information necessary to identify the cause, mode, and manner of death or the contributing factors to his death.

129. Gabe's parents attempted to rectify this by giving permission to the coroner to exhume his body to re-examine his brain.  While the exhumation was conducted in June, five months after his burial, a re-examination was not possible because of the passage of time.

130. Without a complete autopsy based on all the facts that Defendants withheld, Gabe's parents were deprived of evidence that would help prove their wrongful death claim.

131. Litigation over Gabe's suicide, mental and physical health, and his death was probable and foreseeable.

132. The concealment of the attack on Gabe and his loss of consciousness will disrupt Plaintiffs' cases because they lack additional evidence about the extent and nature of the brain injury and the cause mode and manner of death and the contributing factors toward his death. Without all the evidence, it will be harder to succeed on their claims.  They also had to go to additional lengths to consent to the exhumation to try to recover the lost evidence.  They face additional expense, emotional disruption of their lives, among a myriad of challenges they should not have to suffer.

**Defendants Ruthenia Jackson and Jeffery McKenzie Were Deliberately Indifferent to the Danger Gabe Faced at Carson and By Their Actions, Increased the Risk of Danger to Gabe**

133.    Defendants Jackson and McKenzie were notified of a student hurt in the bathroom. They both responded to the bathroom and found Gabe on the floor unconscious.  They knew from their own personal observations that he was unconscious for at least two minutes, and from viewing the video, they would have known he was unconscious for over seven minutes.  They also know the history of bullying, violence, and aggression Gabe faced at Carson since the first grade and that the violence against him was increasing to such an extent it was impacting his ability to learn.

134.    Defendants Jackson and McKenzie knew that Gabe was in their custody and was dependent on them to protect him.

135.    Defendants Jackson and McKenzie knew that when unsupervised, the bathrooms were unsafe, secluded locations at Carson where students were at risk of being injured.  They also had access to the video of the bathroom attack. They knew or should have known that Gabe was assaulted and bullied in the bathroom and that he was unconscious for more than seven minutes.

136.    Defendants Jackson and McKenzie knew of the obvious risk of bullying and related suicidal ideation to their students. The surveillance recordings and logs illustrate the obvious risk students at Carson faced on a daily basis.

137.    Despite this knowledge, Defendants Jackson and McKenzie took affirmative action to cover-up the attack on Gabe.

138.    Defendants Jackson and McKenzie withheld from Gabe's mother that Gabe was attacked, other boys were attacked, the bathroom was unsupervised, and Gabe lay unconscious

on the bathroom floor for over seven minutes. Pursuant to CPS Defendants' policies and practice of minimizing injuries associated with bullying and aggression, Defendants Jackson and McKenzie expected nursing staff to follow the policies and practice by minimizing and covering up Gabe's injuries. Nurse McLaughlin acted consistently with Defendants Jackson's and McKenzie's established policies and practice when she told his mother that he had only fainted and did not need medical treatment.

139. In an official statement, CPS stated that nurse McLaughlin told Ms. Reynolds to take Gabe to the hospital. CPS knew its statement was not true and was contrary to nurse McLaughlin's own medical records. The nursing notes state that nurse McLaughlin contacted the student's mother to pick him up and explicitly state no referral or follow-up care was necessary.

140. These affirmative acts of covering up and harboring the extent of the environment of aggressive behavior that Carson students experienced daily; of the pattern of aggressive behavior toward Gabe generally; of the bathroom attack and injury to Gabe and others, all placed Gabe specifically at risk of further bullying, of emotional distress, of suicidal ideation, and of side effects of an untreated serious head injury.

141. To date, CPS Defendants have not investigated the bullying, aggression and violence Gabe suffered at Carson, including the bathroom attack, in violation of CPS policy.

142. Defendants Jackson and McKenzie did not document the bathroom attack, in violation of CPS policy.

143. Defendants Jackson and McKenzie did not report the bathroom attack to Gabe's parents or to the public, in violation of CPS policy.

144. Defendants Jackson and McKenzie did not protect Gabe from further incidents of bullying, violence, and aggression, in violation of CPS policy and the Constitution.

145. This complete failure to respond to the known pattern of aggressive behavior Gabe experienced at Carson, along with Defendants Jackson's and McKenzie's failure to respond to the bathroom attack, constituted deliberate indifference to Gabe's safety at Carson and to his ability to learn.

146. Defendants Jackson and McKenzie created a special relationship with Gabe by withholding information relevant to his safety and the dangerous climate at the school from his parents. By doing so, these Defendants took on a higher duty to protect Gabe.

147. Defendants Jackson and McKenzie had time to deliberate before choosing a course of action. They learned of the attack on Gabe, or should have learned of the attack, as soon as they accessed the surveillance recordings of the incident. They knew the next day that Ms. Reynolds called the school to report Gabe became ill and had to go to the hospital overnight so he would not be in school on January 25, 2017. They had additional time to reveal potentially lifesaving facts to his mother by telling the truth before he committed suicide. They chose to do nothing.

148. Defendants Jackson and McKenzie had no legitimate governmental purpose for covering up Gabe's assault and bullying. These actions shock the conscience.

149. Defendants Jackson's and McKenzie's actions were negligent, knowing, deliberately indifferent, reckless, extreme, and outrageous.

150. In addition, Defendants Jackson and McKenzie knew that the attack in the bathroom constituted child abuse against Gabe under O.R.C. § 2151.031. However, Defendants Jackson and McKenzie did not report the child abuse, as required by O.R.C. § 2151.421.

151.   Defendants Board of Education and Ronan ratified the actions of Defendants Jackson and McKenzie and are thus liable for their violations of Gabe's substantive due process right to be protected.  The Board of Education and Ronan did not conduct a meaningful investigation of Defendants Jackson's and McKenzie's actions covering up the bathroom attack, did not discipline or retrain Defendants Jackson and McKenzie, or author new policies to protect students.  The Board of Education allowed Defendant Jackson to seek a reassignment from Carson for the 2017-2018 school year, but did not remove her from Carson.  Defendant Jackson gave Defendant McKenzie a poor evaluation in June 2017, but did not criticize his actions related to any allegation in this compliant.  The Board of Education allowed Defendant McKenzie to voluntarily resign from Carson. The Board of Education and Ronan's ratification of the Defendants' actions was the moving force behind the constitutional violation.

### CPS Defendants Encouraged Nursing Staff to Minimize Student Injuries Caused by Aggressive Behavior

152.   CPS Defendants and the school nurse knew protocols required that in the event of a loss of consciousness, 911 should be called. Nurse McLaughlin treated Gabe in the bathroom and in her office. He was unconscious when she arrived but regained consciousness soon after she arrived.  Defendants informed her that he had been unconscious at least from the time that Defendant McKenzie had found him unconscious. However, no one ever called 911 for Gabe.

153.   CPS Defendants knew that Gabe was in their custody and was dependent on them for medical treatment and protection.

154.   The school nurse knew that Gabe hit his head when he fell and that there were several surfaces that he could have hit on such as the wall, the floor, and/or the garbage can. She noted in her file that Gabe told her that he hit his head.  Based on the information Defendants

told her, she misled Ms. Reynolds of the seriousness of the incident and injuries and only told Ms. Reynolds that Gabe had fainted.

155.   Consistent with Carson policy and practice to cover-up and harbor the extent of the aggressive behavior that Carson students experienced daily, Defendants did not follow, nor have the nurse follow, the same standard medical procedures that would have been followed had Gabe's head been injured in an accident.

156.   CPS Defendants were neglectful in assessment and care of the injuries Gabe sustained, and intentionally mislead Ms. Reynolds in their communication of the type and extent of injury suffered by aggressive behaviors on that date.

157.   CPS Defendant's official statement, taking the position that nurse McLaughlin told Ms. Reynolds to take Gabe to the hospital, is unsupported by any record or evidence.

158.   CPS Defendants' complete failure to inform his parents of the extent and cause of his injuries was deliberately indifferent to Gabe's safety while he was in CPS's custody; created a special relationship with Gabe by deliberately withholding information relevant to his safety from his parents and by doing so, they took on a higher duty to protect Gabe.  Defendants had time to deliberate before choosing a course of action; they had no legitimate governmental purpose for covering up Gabe's injuries and assault; their actions shock the conscience; and their actions were negligent, knowing, deliberately indifferent, reckless, extreme, and outrageous.

159.   As a result of Defendants' actions, Gabe's injury was incorrectly diagnosed, went untreated, decreased his chance of survival, and ultimately lead to his death.

**Damages**

160.   Defendants' actions caused Gabe's severe emotional distress. The source/origin of this is the continuous personal physical injury to Gabe.   Gabe suffered physical injuries and

associated severe mental and emotional distress from being a victim of and witness to bullying, violence, and student-on-student aggression at Carson, as well as from the effects he suffered from being bullied and attacked at school.

161.   This severe mental and emotional distress was a substantial factor that lead to his suicide, the ultimate personal physical injury.

162.   Shortly after bringing Gabe home after school, his mother found Gabe hanging from his bunk bed by his necktie. She was forced to cut him down. She then started CPR on her unresponsive eight-year-old son.  As a nurse, she knew she could not stop performing CPR, but it was so hard to give CPR to her own lifeless child.

163.   Her agonizing screams could be heard throughout the apartment building and neighbors came to her aid to help with CPR.

164.   When she called 911, the operator struggled to understand the few words she was able to get out between the screaming.[14]

165.   Gabe's mother's emotional distress, resulting from her sensory and contemporaneous observance of Gabe's injuries and death, was severe. The source/origin of this emotional distress is the personal physical injury to Gabe.

166.   Both Gabe's mother and father have suffered severe emotional distress as a result of his tragic and very untimely death.

167.   Until she gave birth to Gabe, Cornelia Reynolds had no idea how much love she had to give. Cornelia misses her only child every day.  Her life is empty without her only child, her best friend.  She has flashbacks of images of Gabe hanging that she is unable to ignore.  It is hard for her to be around other children and hear their giggles and watch them play.  In life, she felt

---

[14] Exhibit B is a copy of the call Ms. Reynolds made to 911 on January 26, 2017.

Gabe was her angel. In death, she feels he is now her guardian angel, watching over her from heaven, in her ever-sad journey without him.

168.    After Gabe was attacked by two boys in early January, Ms. Reynolds became concerned for Gabe's safety at Carson. She knew Gabe was not as happy about going to Carson lately so she researched other schools for Gabe and sent away for information from St. Francis De Sales School. The day after Gabe died, Ms. Reynolds found in her mail St. Francis De Sales School's packet of information. She burst into tears. If she had only known the extent of the abuse, bullying, aggression, and violence Gabe suffered and witnessed at Carson, she would have removed him from that school immediately. By secreting the extent of the violence at Carson and the attack on Gabe in the bathroom two days before his death, Defendants deprived Ms. Reynolds of her ability to protect her son.

169.    Benyam Taye lost a future with his first-born son, Gabe. He will never see Gabe graduate from high school or college nor will he be able to attend his son's wedding or see the joy on Gabe's face when Gabe had his own family. Mr. Taye loved his son who dreamed of joining the military. His father fondly remembers the trip he took Gabe on to Robins Air Force Base in Georgia where he saw how happy it made Gabe to dream of a life in the military. His father will never again be able to share such precious moments with his son or see his son's dreams come true.

170.    Mr. Taye spends many of his waking hours driving alone. During these drives, he has flashbacks and sees only Gabe and his smile. He misses Gabe's sense of humor and the way they spent their hours together. Mr. Taye feels he was robbed of a life filled with Gabe's joy. At times, late at night, he cannot decipher if this is a bad dream or real life. Mr. Taye is haunted by

33

the images of 17 children stepping over, taunting, and hurting his innocent, young boy. He will forever cherish the messages from Gabe that always ended in, "I love you."

171. Gabe's parents' distress, circumstances, and responses were reasonably foreseeable.

172. Plaintiffs the Estate of Gabe Taye, Ms. Reynolds, and Mr. Taye have suffered the following damages as a result of Defendants' wrongful conduct as described above, the source/origin of which is personal physical injury: loss of services, loss of society, including loss of companionship, relationship, consortium, care, assistance, attention, advise, mental anguish, pecuniary losses, and funeral and burial expenses.

173. The destruction of video evidence by Cincinnati Public Schools will cause Plaintiffs the Estate of Gabe Taye, Ms. Reynolds, and Mr. Taye to suffer damages by disrupting their ability to litigate these causes of action successfully and to the fullest extent possible.

## V. FIRST CAUSE OF ACTION – § 1983 – STATE CREATED DANGER

174. Defendants have, under color of law, deprived Gabriel Taye and Plaintiffs of rights, privileges, and immunities secured to them by the United States Constitution including the right to due process under the Fourteenth Amendment, and specifically to the right to be free from affirmative actions directly increasing Gabriel Taye's vulnerability or otherwise placing him in danger and taking away from his parents their ability to protect him.

175. Defendants acted with deliberate indifference when they put Gabriel Taye's life at risk and caused him to suffer greatly before his death. Defendants acted with deliberate indifference when they concealed from his parents the danger Gabriel Taye was in at school, causing them serious emotion distress when they could not protect him.

## VI. SECOND CAUSE OF ACTION – § 1983 – SPECIAL RELATIONSHIP

176.   Defendants have, under color of law, deprived Gabriel Taye and Plaintiffs of rights, privileges, and immunities secured to them by the United States Constitution including the right to due process under the Fourteenth Amendment, and specifically to the right to be kept safe when a special relationship has been created and by taking away from his parents their ability to protect him.

177.   Defendants' actions put Gabriel Taye's life at risk and caused him to suffer greatly before his death, the source/origin of which was personal physical injury. Defendants acted with deliberate indifference when they concealed from his parents the danger Gabriel Taye was in at school, causing them serious emotional distress when they could not protect him.

## VII.   THIRD CAUSE OF ACTION – § 1983 – SHOCKS THE CONSCIENCE

178.   Defendants have, under color of law, deprived Gabriel Taye and Plaintiffs of rights, privileges, and immunities secured to them by the United States Constitution including the right to due process under the Fourteenth Amendment, and specifically to his right to be free from government actions that shock the conscience.

179.   Defendants' actions put Gabriel Taye's life at risk and caused him to suffer greatly before his death, the source/origin of which was personal physical injury. Defendants acted with deliberate indifference when they concealed from his parents the danger Gabriel Taye was in at school, causing them serious emotional distress when they could not protect him.

## VIII.   FOURTH CAUSE OF ACTION – §1983 – EQUAL PROTECTION

180.   Defendants have, under color of law, deprived Gabriel Taye and Plaintiffs of rights, privileges, and immunities secured to them by the United States Constitution including the right to equal protection under the Fourteenth Amendment.

181. Defendants violated Gabriel Taye and Plaintiffs' equal protection rights when they treated students who were victims of bullying and student-on-student aggression differently than they treated students who were in accidents at school. While students who experience accidents at school are given appropriate and adequate medical treatment, and their parents are informed of the incident, students who are victims of bullying and student-on-student aggressive behavior are not protected, their medical needs are not taken seriously, and their parents are not informed of the incident or the injury, thus depriving them of the ability to protect their son.

182. There is no rational basis in treating these two groups differently.

183. Defendants' actions put Gabriel Taye's life at risk and caused him to suffer greatly before his death. Defendants acted with deliberate indifference when they concealed from his parents the danger Gabriel Taye was in at school, causing them serious emotional distress when they could not protect him.

### IX. FIFTH CAUSE OF ACTION - §1983 – CINCINNATI PUBLIC SCHOOLS MUNICIPAL LIABILITY

184. Defendants Cincinnati Board of Education and Superintendent Ronan failed to provide an adequate policy to guide defendants, school officials, and teachers responding to bullying, violence, and student-on-student aggression such as what happened to students like Gabriel Taye.

185. Defendants Cincinnati Board of Education and Superintendent Ronan failed to adequately train and supervise defendants, school officials, and teachers on how to respond to incidents like those experienced by students like Gabriel Taye.

186. Defendants Cincinnati Board of Education and Superintendent Ronan failed to conduct a meaningful investigation into the actions of Defendants Principal Jackson and

Assistant Principal McKenzie and thus ratified their actions as official CPS policy, causing CPS to be liable for their constitutional violations.

187. The failure to provide adequate policies, training, supervision, monitoring, and investigation of Defendants Jackson's and McKenzie's actions was outrageous and deliberately indifferent to the rights of students, including Gabriel Taye.

188. Defendants Cincinnati Board of Education and Superintendent Ronan's rules, regulations, customs, policies, practices, usages, procedures, inadequate training and supervision, and ratification of Defendants Jackson's and McKenzie's actions, were all inadequate and unreasonable and were the moving force behind the constitutional deprivations suffered by Gabriel Taye and Plaintiffs.

## X.    SIXTH CAUSE OF ACTION - WRONGFUL DEATH

189. Defendants Jackson's and McKenzie's actions caused the wrongful death of Gabriel Taye resulting in damages recoverable under O.R.C. § 2125.02, including, but not limited to, complex grief and agonizing mental anguish to his parents. The wrongful death claim against these Defendants is brought against each only in their individual capacity.

190. Gabriel Taye's presumptive next of kin include his mother, Cornelia Reynolds, and his father, Benyam Taye. They have suffered loss of his support, services, society, and severe mental anguish from his death. There are also statutorily defined next of kin who may have suffered loss of support, services, society, and mental anguish from his death. The Estate has incurred funeral and medical bills from his death.

## XI.     SEVENTH CAUSE OF ACTION – INTENTIONAL INFLICTION OF SERIOUS EMOTIONAL DISTRESS

191.    Defendants Jackson and McKenzie have, by their extreme and outrageous conduct, intentionally or recklessly inflicted severe emotional distress on Gabriel Taye, Cornelia Reynolds, and Benyam Taye.

192.    The distress inflicted on Gabriel Taye by Defendants Jackson and McKenzie was the originating substantial factor in Mr. Taye's suicide, the ultimate personal physical injury.

## XII.     EIGHTH CAUSE OF ACTION – NIED

193.    Defendants Jackson and McKenzie negligently and recklessly inflicted severe emotional distress on Cornelia Reynolds, a bystander to her son's suicide.

194.    Defendants Jackson and McKenzie negligently and recklessly inflicted severe emotional distress on Cornelia Reynolds and Benyam Taye, each bystanders to watching the recording of their son being assaulted and left unconscious on the bathroom floor.

195.    Defendants Jackson's and McKenzie's actions were not only negligent, but were reckless.

## XIII.   NINTH CAUSE OF ACTION – LOSS OF CONSORTIUM

196.    Plaintiff Cornelia Reynolds was the mother of Decedent Gabriel Taye. Plaintiff Benyam Taye was the father of Decedent Gabriel Taye.

197.    As a result of the wrongful acts of Defendants Jackson and McKenzie, Plaintiffs Cornelia Reynolds and Benyam Taye were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, affection, assistance, and parental fellowship of their dearly beloved son.

198. All injuries and damages described above were proximately caused by the wrongful acts of Defendants Jackson and McKenzie, the source/origin of which is the personal physical injury to Gabe.

## XIV. TENTH CAUSE OF ACTION – FAILURE TO REPORT CHILD ABUSE UNDER O.R.C. § 2125.421

199. Gabriel Taye was an abused child under O.R.C. § 2151.031.

200. Defendants Jackson and McKenzie were aware that Gabriel Taye was an abused child under the statute.

201. This child abuse was not reported by Defendants Jackson or McKenzie, as required under O. R.C. § 2151.421. As a result of these Defendants' failure to report child abuse, Gabriel Taye suffered further injury, including mental anguish and severe emotional injury prior to his death.

## XV. ELEVENTH CAUSE OF ACTION - SPOLIATION

202. Defendants knowingly, willfully, and in bad faith destroyed evidence it had an obligation to preserve. The destroyed evidence was relevant to probable litigation. This evidence was critical to Plaintiffs proving their claims.

203. That destruction has disrupted Plaintiffs' ability to litigate the case and caused further damages to Gabriel Taye and Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court award:

A. Compensatory damages in an amount to be shown at trial;

B. Punitive damages against the individual defendants in an amount to be shown at trial (punitive damages are not sought against Cincinnati Board of Education or Ronan in her official capacity);

C.  Costs incurred in this action and reasonable attorney fees under 42 U.S.C. §1988;

D.  Prejudgment interest; and

E.  Such other and further relief as this Court may deem just and appropriate.

## JURY DEMAND

Plaintiff requests a jury trial on all claims triable to a jury.

Respectfully submitted,

/s/ Jennifer L. Branch
Jennifer L. Branch (0038893)
Trial Attorney for Plaintiff Estate of
Gabriel Taye and Cornelia Reynolds
Alphonse A. Gerhardstein (0032053)
Janaya Trotter Bratton (0084123)
Counsel for Plaintiff Estate of
Gabriel Taye and Cornelia Reynolds
Gerhardstein & Branch Co. LPA
441 Vine Street, Suite 3400
Cincinnati, Ohio 45202
Tel: (513) 621-9100
Fax: (513) 345-5543
jbranch@gbfirm.com
agerhardstein@gbfirm.com
jtbratton@gbfirm.com

/s/ Carla L. Leader
Carla L. Leader (0081597)
Counsel for Plaintiff Estate of
Gabriel Taye and Cornelia Reynolds
The Law Office of Carla Loon
Leader, LLC
420 W. Loveland Avenue, Suite 109
Loveland, OH  45140
Telephone: (513) 909-4332
Fax: (513) 206-9994
carla@carlaleader.com

/s/ Michele L. Young
Michele L. Young (0062011)
Gregory S. Young (0033617)
Counsel for Plaintiff Estate of
Gabriel Taye and Benyam Taye

Gregory S. Young Co., LPA
600 Vine Street, Suite 402
Cincinnati, OH  45202
Telephone: (513) 721-1077
Fax: (513) 721-1919
myoung@younginjurylaw.com
gyoung@younginjurylaw.com